Leah A. Martin, Esq.
Nevada Bar No. 7982
Kevin Hejmanowski, Esq.
Nevada Bar No. 10612
LEAH MARTIN LAW
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
Telephone: (702) 420-2733
Facsimile: (702) 330-3235
lmartin@leahmartinlv.com
khejmanowski@leahmartinlv.com

Raja Rajan (*Pro Hac Vice Admission Pending*)
Pennsylvania Bar No. 58849
RAJAN LAW GROUP
2009 Chestnut Street
Philadelphia, Pennsylvania 19103

*Attorneys for Plaintiff Visual*
*Technology Innovations, Inc.*

# UNITED STATES DISTRICT COURT

## DISTRICT FOR NEVADA

| | | |
|---|---|---|
| VISUAL TECHNOLOGY INNOVATIONS, INC. | ) ) ) | |
| Plaintiff, | ) ) | Civil Action |
| v. | ) ) | Case No. 2:24-cv-00728 |
| BURLINGTON RESOURCES ASIA LIMITED | ) ) | **VERIFIED COMPLAINT** |
| and | ) ) | |
| TIMOTHY MCCARTHY | ) ) | |
| Defendants | ) ) | |

Plaintiff Visual Technology Innovations, Inc. ("**VTI**") complains against Defendants as follows:

/ / / /

## PARTIES

1.    Plaintiff VTI is a for-profit Nevada corporation with headquarters in Bensalem, PA.

2.    Defendant Burlington Resources Asia Limited ("**Burlington**") has a business address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong, S.A.R.

3.    Defendant Timothy McCarthy ("**McCarthy**") had an address at Old Vicarage, Maxwell Road, London, United Kingdom, SW62HR.

4.    At all times relevant hereto, McCarthy was the Chief Executive Officer and principal owner of Burlington.

## JURISDICTION AND VENUE

5.    Plaintiff VTI is incorporated in Nevada.

6.    Defendant Burlington is a foreign entity and Defendant McCarthy is a resident of a foreign country.

7.    Plaintiff and Defendants executed contract(s) that specify Las Vegas, Nevada is the exclusive location of disputes.

8.    This Court has subject matter jurisdiction over this matter as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and there is complete diversity between a Nevada entity and the Defendants. 28 U.S.C. § 1332(a)(2).

## BACKGROUND

9.    In February of 2021, an individual named Timothy McCarthy indicated that he would invest in VTI.

10. McCarthy wanted to be a "white knight" to rescue VTI with his investment monies, which he planned to come through his company Burlington.

11. The Chief Executive Officer ("**CEO**") of VTI is Mathu Rajan.

12. Mathu Rajan also founded another company earlier than VTI called Stream TV Networks, Inc. ("**Stream TV**").

13. Mathu Rajan worked for over ten (10) years as the CEO of Stream TV to develop new technology in the area of 3D viewing.

14. The 3D technology of Stream TV could be used for TVs, tablets, and cell phones to view 3D images in video without viewing glasses.

15. In May of 2020, a group of investors in Stream TV looted the technology and all assets of Stream TV in May of 2020 claiming ownership under a private contract that was enacted by minority board members without shareholder approval.

16. That group of investors also took from Stream TV many employees and many trade names and attempted to make Stream TV an empty shell so it could not compete with them in the future.

17. That group of investors also walked away from millions of dollars of trade debt and started a new company with the technology/assets of Stream TV.

18. A Delaware Trial Court upheld that transfer of ownership of the technology/assets of Stream TV, but that ruling was overturned by the Delaware Supreme Court.

19. The Delaware Supreme Court found the private contract used to transfer the technology/assets was invalid as it violated Delaware state corporate laws requiring shareholder approval for such extraordinary transfers.

20. In early 2021, when McCarthy entered the picture, Mathu Rajan and Stream TV had not yet appealed the lower court ruling but were convinced that the Delaware Trial Court was in error in upholding the private contract that took away everything from Stream TV.

21. McCarthy convinced Mathu Rajan and VTI that he could help in the appeal with his money such that VTI and Mathu Rajan could regain the 3D technology/assets that were illegally taken from Stream TV.

22. On February 10, 2021, McCarthy, through Burlington, signed an investment term sheet that outlined his intended investment.  That term sheet is attached hereto as **Exhibit A**.

23. On the same date, McCarthy, through Burlington, also signed an agreement called an Investor Rights Agreement ("**IR**"). That agreement is attached hereto as **Exhibit B**.

24. Typically, IR type contracts are signed contemporaneous with the actual closing of investment monies and not before since they usually provide for investor/shareholder rights at actual investment.

25. However, McCarthy wanted control over VTI even before he executed definitive documents for his investment.

26. Eleven (11) days later, on February 21, 2021, McCarthy signed a document called the "Stock Purchase Agreement." ("**Stock Purchase**").  That agreement is attached hereto as **Exhibit C**.

27. The Stock Purchase agreement promised investment of thirty million dollars (USD $30,000,000) in VTI.

28. Then on May 3rd and 6th McCarthy, through Burlington, signed amendments increasing the amount of promised investments to three hundred million dollars

($300,000,000). The May 6th amendment is called "**$300m Amendment**" and attached hereto as **Exhibit D**.

29. Just four (4) days later, on May 10th, 2021, McCarthy, through Burlington, signed another amendment increasing the amount of promised investment in VTI to five hundred million dollars (USD $500,000,000). The May 10th amendment is called "**$500m Amendment**" and attached hereto as **Exhibit E**.

30. McCarthy was the consummate salesman through the whole process of promising investments.

31. McCarthy charmed VTI representatives and agents, opposing counsel in the Stream TV litigation and even the United States Bankruptcy Court in legal proceedings.

32. Mathu Rajan had caused Stream TV to file for restructuring help in the United States Bankruptcy Court and counted on McCarthy/Burlington and their promised money into VTI as part of the restructuring plan for Stream TV.

33. McCarthy used his charm to induce VTI to wait for his investment monies to close and increased investment amounts to induce patience.

34. As demonstrated below, McCarthy even displayed a bank statement showing he had the funds to invest.

35. On or about May 10,2021, McCarthy testified in United States Bankruptcy Court about his investment and displayed no hesitancy to invest.

36. In fact, he enthusiastically testified that his money was not contingent or conditional and that he had completed all due diligence for the deal.

37. He provided an affidavit to the United States Bankruptcy Court that $120 million of his investment promise was a commitment and more money as an option.

38. At that time only Exhibit D was executed.

39. Later that day, Exhibit E was enacted and increased the investment amount to USD $500 million dollars and had no contingency or option.

**COUNT I**
**(VTI v. Burlington and McCarthy)**
**(BREACH OF CONTRACTS)**

40. All the averments above are incorporated herein by reference.

41. Burlington made promises of investments in contracts as displayed in the Exhibits (A-E).

42. All of those contracts were properly formed and agreed.

43. VTI fulfilled all of the obligations in those contracts.

44. Burlington, through McCarthy, materially breached those contract promises.

45. At all times relevant hereto, Burlington was McCarthy's personal investment vehicle.

46. McCarthy should not enjoy corporate veil protections as a result of Burlington.

47. McCarthy used Burlington to commit fraud against VTI and all its representatives.

48. McCarthy failed to observe corporate formalities at Burlington.

49. Burlington was undercapitalized in relation to the fraudulent promises made to VTI.

50. Upon information and belief, McCarthy commingled his personal funds with Burlington funds as Burlington was owned by McCarthy and was his personal corporate vehicle.

51. Burlington through McCarthy engaged in fraudulent behavior.

52. Burlington failed to follow corporate formalities.

53. Burlington is and was merely a facade or a tool for McCarthy to conduct his activities without assuming any personal liability.

54. McCarthy caused harm to VTI and others that counted and relied on VTI and Stream TV succeeding through the promises of McCarthy.

55. In addition to the monies that VTI lost in terms of the investment promises, VTI also took investments from others who counted on McCarthy's investment to invest.

**WHEREFORE,** Plaintiff asks for judgment in its favor against Defendants, jointly and severally, for USD $500,000,000.00 or an amount proven at trial, interests and costs, and any other relief deemed appropriate by the Court.

### COUNT II
### (VTI v. McCarthy)
### (FRAUD)

56. All the averments above are incorporated herein by reference.

57. At all times relevant hereto, Burlington was McCarthy's personal vehicle.

58. The fraud was not only in the inducement but also ongoing fraud to allow McCarthy to assert his power at VTI even before investments from Burlington were made in VTI.

59. McCarthy provided his alleged qualification to rescue Mathu Rajan and VTI with an email of his prior alleged accomplishments.  That email is attached hereto as **Exhibit F**.

60. That email, Exhibit F, reveals McCarthy bragging about his alleged prior deals and his closeness with famous people like Sir Richard Branson.

61. McCarthy, through Burlington, promised that thirty million dollars (USD $30,000,000) would be invested, then they changed the investment amount to USD $300,000,00 and then yet again to USD $500,000,000.

62. The increasing amounts of the promised investment amounts were  made through the ongoing fraud/misrepresentations of McCarthy.

63. Though his investment was promised and not yet closed, McCarthy wanted to ensure his intended ownership in VTI was allocated for him; he revealed his greed and anxiousness.

64. He (McCarthy) caused VTI to obtain another investor before him in order to close on his monies through Burlington.

65. Some of the examples of the fraud and falsity by McCarthy are:

    a.  Inducement of the investment promises;

    b.  Displaying to VTI and its representatives that he had much successful business experience and was very wealthy;

    c.  The showing of bank statements to convince VTI and others of his financial wherewithal.

    d.  Seeking his ownership allocation even before his investment;

    e.  Convincing many people at VTI he had a strong network of potential investors that he could employ for VTI;

    f.  Seeking board membership for himself and his colleague in VTI even before his monies in VTI were closed upon; and

    g.  Convincing VTI that it could use the tools allowed in the Bankruptcy Court process to regain the assets of Stream TV with his money.

66. McCarthy knew that he was committing those falsities, yet he persisted.

67. McCarthy provided a document in a Zoom call which purportedly was a bank statement of Burlington that showed a balance of $103,018,461.95; McCarthy used that bank statement to induce VTI and other investors that he had the financial wherewithal to invest as promised.  That bank statement is attached hereto as **Exhibit G**.

68. McCarthy caused another company called Knights Asia Limited, which allegedly held his money, to  convince investors to invest in VTI because he had liquid cash to invest immediately.  That document is attached hereto as **Exhibit H**.

69. McCarthy convinced VTI through fraud to appoint him and his colleague to the board of directors of VTI even before his/Burlington's investment closed.

70. The colleague of McCarthy that he added to VTI board of directors may have been unqualified and in a personal relationship with McCarthy.

71. McCarthy became extensively involved with VTI in nearly all aspects.

72. McCarthy had numerous calls with VTI personnel to convince them of his sincerity.

73. It is evident that McCarthy never intended to invest in VTI and only strung it along through fraud.

74. VTI was fooled by the fraud of McCarthy to much detriment.

75. VTI's reliance on the misrepresentation of McCarthy was justifiable.

76. VTI had other investors and VTI counted on McCarthy/Burlington to remain viable as an entity for benefit of all shareholders.

77. VTI has been sued by other investors angry with the information about investment by McCarthy that they claim induced them to invest in VTI.

78. McCarthy conduct was outrageous and intentional where punitive or exemplary damages may be awarded.

////

**WHEREFORE,** Plaintiff asks for judgment in its favor against Defendants for the amount proven at trial for compensatory damages, an award of punitive damages, an award of interests and costs, and any other relief deemed appropriate by the Court.

Dated this 27th day of March 2024.

LEAH MARTIN LAW


*/s Kevin Hejmanowski, Esq.*
Leah Martin, Esq.
Kevin Hejmanowski, Esq.
601 South Rancho Drive, Suite C-26
Las Vegas, Nevada 89106
*Attorneys for Visual Technology Innovations, Inc.*

## IN THE UNITED STATES DISTRICT COURT FOR NEVADA

| | | |
|---|---|---|
| VISUAL TECHNOLOGY INNOVATIONS, INC. | ) ) | |
| Plaintiff, | ) ) ) | Civil Action |
| v. | ) ) | Case No. |
| BURLINGTON RESOURCES ASIA LIMITED | ) ) | **VERIFIED COMPLAINT** |
| and | ) ) | |
| TIMOTHY MCCARTHY | ) ) | |
| Defendants | ) ) ) | |

## VERIFICATION

I, Mathu Rajan, hereby declare and affirm that the facts recited in the foregoing Complaint are true and correct, to the best of my knowledge, under penalty of perjury.

_____

Mathu Rajan, Chief Executive Officer and Founder of Plaintiff

Date: March __, 2024

# Exhibit A
# -Burlington Term Sheet-

VTI-TS(30) 210210-Common

## TERM SHEET

### Proposed Private Placement Investment inConvertible Debt

The following is a summary of the principal terms with respect to a proposed investment inClass A Common Shares of Visual Technology Innovations, Inc. as an offering to accredited investors. This is a non-binding Term Sheet setting for a summary of the proposed terms of the transaction and is intended solely as a basis for further discussion and is not intended to be, and does not constitute, a legally binding obligation of any party. A legally binding obligation will be established only pursuant to mutually acceptable definitive written agreements executed by the parties. In the event of any inconsistency between this summary and such definitive written agreements, the definitive agreements will govern.

| | |
|---|---|
| Issuer: | Visual Technology Innovations, Inc., a Nevada, USA Corporation(the "**Company**"). |
| Purchaser: | The purchaserBurlington Resources Asia Limited("**Purchaser**") is an accredited investor and has a principal place of business at 20<sup>th</sup>Floor, 88 Gloucester Road, Wanchai, Hong Kong. Purchaser and the Company may together be referred to as the "**Parties**" and individually as "**Party**." |
| Amount: | Purchaser will invest a total of thirtymillion US dollars (US $30,000,000) ("**Investment**") in the Securitystarting on or before February10, 2021("**Execution**") through the Term. |
| Proof of Funds: | The Purchaser will deliver to the Company a satisfactory form of proof demonstrating the availability of the Investment amount. |
| Closings: | The Purchaser elects to exercise the option to purchase one million US dollars (US $1,000,000) in the Security immediately upon Execution. The funds would be made available in thirty (30) calendar days from Execution ("**Initial Closing**").The Company will present to the Purchaser a selection of business opportunities ("**Presentation**") needing additional funds ("**Amount**") at various times during the Term, which has to be closed within twenty (20) calendar days from the Presentation. The form of the Presentation will be included in the closing documents. Each Presentation will constitute a "**Closing**" and will be considered a part of the Investment. Upon the absence of a Closing, the Investment balance will be reduced by the Amount. Each Closing, including the Initial Closing may be together referred to as "**Closings**". All Closings should be completed within the earlier of eighteen (18) months from Execution or Exit ("**Term**"). |
| Exit: | The earlier of (i) closing of an access to the public markets; (ii) merger or acquisition when there is a change of control |
| Security: | Class A Common Shares of the Company (the "**Security**"). |
| Price: | The price of the Security will be $1.40 per share. |
| Signing Bonus: | The Purchaser will be issued 987,839 shares of the Security upon execution of the closing documents to be issued pursuant to the acceptance of this Term Sheet. |
| Contingent Bonus: | In the situation that the Purchaser has not exercised any option to invest beyond the Initial Closing, the Purchaser will be issued an additional 1,141,230 shares of the Security upon at the end of the Term. |
| Board Seat: | The Purchaser will be awarded one (1) board seat on the Company's Board of Directors as soon as the total value of the Closings is more than five million US dollars (US $5,000,000). If Purchaser has made Closings to a total value of fifteen |

VTI-TS(30) 210210-Common

| | |
|---|---|
| | million US Dollars ( US$ 15,000,000)the Purchaser may have three (3) board seats on the Company's Board of Directors in which there are a maximum of six (6) Directors. |
| Placement Agents: | Such placement agents as the Company may disclose to the Purchaser. Such placement agents shall be compensated on such terms as the Company may agree to in its discretion. |
| Use of Proceeds: | The Company will use the proceeds, net of applicable placement agent fees, for any lawful general business purpose related to the Company. |
| Confidentiality: | Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Term Sheet or the agreements contemplated herein, discussions or negotiations relating to this Term Sheet or the agreements contemplated herein, the performance of its obligations under the agreements contemplated herein or the ownership of the shares purchased under such agreements. |
| Expenses: | Each party to this transaction shall bear its own expenses, including but not limited to legal fees. |

Accepted and agreed to, this ____ day of February,2021, by each of the Parties set forth below:

Company: Visual Technology Innovations, Inc.       Purchaser: Burlington Resources Asia Limited

By: _____                      By: _____

Name:    Mathu Rajan                               Name:    Timothy McCarthy

Title:    President                                 Title:    CEO

Date:    February 10, 2021                          Date:    10 02 21

# Exhibit B
## -Burlington Investor Rights Agreement-

VTI Investor Rights Agreement 210210

## INVESTOR RIGHTS AGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021(the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "Company") and Burlington Resources Asia Limited, with an address at 20<sup>th</sup>Floor, 88 Gloucester Road, Wanchai, Hong Kong  (the "**Investor**"), with the Company and the Investor together referred to as the "Parties."

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares ("**Shares**") issued by the Company; and

**WHEREAS,**the Investor desires to purchase the Shares on the terms and conditions set forth in that certain Purchase Agreement by and between Company and Investor as of the date hereof ("**Purchase Agreement**"); and

**WHEREAS,** Company and Investor desire to specify other rights and obligations of both parties with respect to the transactions set forth in the Purchase Agreement.

**NOW, THEREFORE**, in consideration of the foregoing recitals and the mutual promises and covenants hereinafter set forth and for other good and valuable consideration, and intending to be legally bound hereby, the parties hereto agree as follows:

1.  Election of Board Members. Upon consummation of the Purchase Agreement for a total of a minimum of five million US dollars (US $5,000,000), the Investorwill be entitled to nominate and elect one duly qualified member to the Board of the Company.If the Investor invests fifteen million US dollars (US $ 15,000,000), the Investor will be entitled to elect up to three duly qualified members to the Board of the Company in which such Board has a maximum of six (6) members. It is currently contemplated that the Board would meet monthly and meetings will be held electronically until further notice.

2.  Information Rights. For so long as the Investor owns at least 5% of the Company'sSharesbut before the earlier of (i) closing of an access to the public markets; (ii) merger or acquisition when there is a change of control, the Company shall furnish the Investor:

     a.  within 90 days after the end of each fiscal year of the Company but as soon as practicable (x) a balance sheet as of the end of such year, (y) statements of income and of cash flows for such year, and (z) a statement of changes in members' equity as of the end of such year, all such financial statements may be unaudited. The Company will make reasonable and normally accepted arrangements to provide for audited financials thereafter.

     b.  within 45 days after the end of each of the first three (3) quarters of each fiscal year of the Company but as soon as practicable, internallyprepared unaudited statements of income and of cash flows for such fiscal quarter, and an unaudited balance sheet as of the end of such fiscal quarter, (except that such financial statements may (x) be subject to normal year-end audit adjustments and (y) not contain all notes thereto that may be required in accordance with GAAP);

VTI Investor Rights Agreement 210210

c.  within 30 days of the start of each new fiscal year but as soon as practicable, a business plan for the new fiscal year, which business plan shall include a budget with underlying assumptions together with updated three-year strategic plans, and promptly after preparation, any revisions to the forecasts contained therein.

3.  Inspection Rights. The Company shall permit the Investor, upon 10 days' prior notice to the Company, to visit and inspect the properties of the Company, to examine its corporate and financial records and to discuss its affairs, finances, and accounts with its executive officers, provided that no such inspection shall disrupt or impede the operations of the Company.  In exercising its rights of inspection hereunder, the Investor agrees to maintain the confidentiality of all financial and other confidential information of the Company disclosed to it.

4.  Miscellaneous.

a.  Governing Law and Sole Choice of Jurisdiction. The validity, interpretation, construction and performance of this Agreement shall be governed by the laws of the State of Nevada, USA without giving effect to the principles of conflict of laws. The Federal and state courts of Las Vegas, NV shall have exclusive jurisdiction over any matters pertaining to this Agreement.  Each of the parties (i) irrevocably consents to the jurisdiction and venue of any Federal and state courts of Las Vegas, NV, (ii) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (iii) agrees that it will not bring any action relating to this Agreement or any of the transactions contemplated by this Agreement in any court other than any court set forth herein.

b.  Amendment and Waiver. Any provision of this Agreement may be amended, and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only upon the written consent of the Company and the Investor.

c.  Entire Agreement. This Agreement constitutes the entire agreement between the parties relative to the specific subject matter hereof. Any previous or contemporaneous agreement or understanding, whether written or oral, among the parties relative to the specific subject matter hereof is superseded by this Agreement.

d.  Notices. All notices required or permitted hereunder shall be in writing and shall be deemed effectively given: (a) upon personal delivery to the party to be notified; (b) when sent by confirmed email, telex or facsimile if sent during normal business hours of the recipient, if not, then on the next business day; (c) five days after having been sent by registered or certified mail, return receipt requested, postage prepaid; or (d) the next business day after deposit with a nationally recognized overnight courier, specifying next day delivery, with written verification of receipt.  All communications shall be sent, as applicable, to the Company or the Investor at the address or facsimile number set forth on the signature page hereof or at such other address as the Company or the Investor may designate by 10 days' advance written notice to the other.

e.  Severability. In the event one or more of the provisions of this Agreement should, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity,

VTI Investor Rights Agreement 210210

illegality, or unenforceability shall not affect any other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

f. Counterparts. This Agreement may be executed in two or more counterparts (including facsimile counterparts), each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

g. Successors and Assigns. The provisions hereof shall inure to the benefit of, and be binding upon, the successors and assigns of the parties hereto.

h. Titles and Subtitles. The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

i. Termination. Except as provided in this Agreement, the Company's obligations, and the rights of the Investor under this Agreement shall continue in full force and effect through the earlier of the following dates, on which date such rights and obligations shall terminate in their entirety the earlier of: (a) 18 months after the Effective Date;(b) the date of closing of the sale of securities of the Company in a firm commitment underwritten public offering pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act") or (c) the date of closing of a sale, lease, or other disposition of all or substantially all of the Company's assets or the Company's merger with or into or consolidation with any other corporation or other entity, or any other corporate reorganization, in which the holders of the Company's outstanding voting securities immediately prior to such transaction own, immediately after such transaction, securities representing less than a majority of the voting power of the corporation or other entity surviving or resulting from such transaction; provided, however, the covenants set forth in paragraph 2 shall terminate and be of no force or effect when the Company first becomes subject to the periodic reporting requirements of the Securities Exchange Act of 1934, as amended, if such date is earlier than the closing of the sale of securities pursuant to a registration statement filed by the Company under the Securities Act.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _____
Name:    Mathu Rajan
Title:    President
Address:  1105 William Penn Dr
          Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____
Name:    Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage
          Maxwell Road,
          London SW6 2HR

# Exhibit C
# -Burlington Investment Subscription Agreement of February 21, 2021-

VTI Stock Purchase Agreement 210210

## STOCK PURCHASEAGREEMENT

An agreement (this "**Agreement**"), dated as of February 10, 2021 (the "**Effective Date**") , by and betweenVisual Technology Innovations, Inc., a NevadaUSA Corporation(the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong(the "**Investor**"), with the Companyand the Investortogether referred to as the "**Parties**."

**WHEREAS**, the Company is anentity  formed pursuant to the laws of the State of Nevada USAas a Nevada corporation, and

**WHEREAS,**The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  aclass of common stock ("**Common Stock**") having a par value $0.00001 per share which is anticipated will be nullified and replaced on a one-for-one basis with shares of Class A Common Stock by an Amended and Restated Certificate of Incorporation which may soon be filed by the Company with the State of Nevada, such Class A Common Stock  is anticipated to be issued to Investor as a part of this Agreement; and

**WHEREAS**, it is anticipated that a new class of voting only (no economic rights) stock to be known as Class B Voting Stock would be issued to the Company's founder or his wholly-owned entity prior to the issuance of the Class A Common Stock to Investor, such Class B Voting Stock anticipated to have 10:1 voting rights, pursuant to that same Amended and Restated Certificate of Incorporation referenced above , and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor.

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)     Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Thirty Million US Dollars ($ 30,000,000) (the "**Purchase Price**") at a price per share of $1.40 per Share

2)     The Investor will deliver to the Company a satisfactory form of proof demonstrating the ready availability of the Purchase Price under the Investor's authority ("**Proof of Funds**").

3)     The Investorwillinvest one million US dollars (US $1,000,000) in the Shares immediately upon Execution. The funds would be made available in thirty (30) calendar days from Effective Date ("**Initial Closing**").

VTI Stock Purchase Agreement 210210

4)    The Company will present to the Investor a selection of business opportunities ("**Presentation**") with the required amount to fund the opportunity ("**Amount**") at various times during the Term, which has to be closed within twenty (20) business days.The form of the Presentation is shown in **Exhibit A**.

5)    The Initial Closing and each Presentationwill constitute a "**Closing**" and will be considered a part of the Purchase Price. Upon the absence of a Closing, the balance of the Purchase Price available to the Investor  that is not yet invested will be reduced by the Amount. Each Closing may be together referred to as "**Closings**".

6)    All Closings should be completed within the earlier of (i) eighteen (18) months from the Effective Date; or (ii) closing of an access to the public markets; or (iii) merger or acquisition when there is a change of control ("**Term**").

7)    The Investor shall pay to the Company in immediately available funds a payment equal to the Amount in each Closing to the Company's bank account ("**Payment**"). The Company's bank wiring instructions are reflected at **Exhibit B**hereto.

8)    In addition, the Company will issue to the Investor 987,839 Shares of the Company immediately on the Effective Date ("**Signing Bonus**").

9)    The Investor will be issued an additional 1,141,230 Shares of the Company if there has not been any further Closings during the Term after the Initial Closing ("**Contingent Bonus**").

10)    The purchase and sale of the Shares shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares will be the date of receipt of funds from each Closing in the designated bank account per Exhibit A.

11)    Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

12)    Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

a.    Organization. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

b.    Capitalization. The Company currently has one class of Common Stock. It is

VTI Stock Purchase Agreement 210210

contemplated in the future that the Company will have two classes of outstanding stock. Therewill be Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock will beas stated in the Certificate of Incorporation, as restated and refiled, and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will befully paid and non-assessable. The fully diluted capitalization of the Company as of close of business January 25, 2020 comprises of 4,349,050 Shares; 5,275,100 warrants that are exercisable into Shares; and 3,500,000 stock options that are exercisable into Shares amounting to a fully diluted total of 13,124,150 Shares.

c.     Authorization. All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing. All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing. This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d.     Valid Issuance of Shares. The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

e.     Governmental or Other Consents and Filings. Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

f.     Litigation. There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

g.  Intellectual Property. Except as set forth in the Disclosure Schedule:

i.     The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property")

VTI Stock Purchase Agreement 210210

in all material respects necessary for its business as currently conducted.

        ii.      The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

        iii.     The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

        iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

        h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

        i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investoracknowledged that it has made its investment based solely on its own due diligence.

        j.     No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

13)     Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

        a.     Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding

VTI Stock Purchase Agreement 210210

obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

     b.     Purchase Entirely for Own Account. Investor confirms that the Shares are being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

     c.     Securities Laws. The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction. The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

     d.     Disqualification. Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

     e.     Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in Section 2 of this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence.Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto. Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its

VTI Stock Purchase Agreement 210210

own independent investigation and verification

## MISCELLANEOUS

14)    Miscellaneous.

a.    <u>Successors and Assigns</u>.    This Agreement may not be assigned by the Investorwithout the express written consent of the Parties.  The provisions hereof shall inure to the benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

b.    <u>Expenses</u>.  Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

c.    <u>Confidentiality</u>.  Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

d.    <u>Placement Agents</u>.  Such placement agents as the Company may disclose to the Investor.  Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

e.    <u>Governing Law</u>.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of NevadaUSA without giving effect to any choice or conflict of law provision or rule (whether of the State of NevadaUSA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

f.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

g.    <u>Titles and Subtitles</u>.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

h.    <u>Notices</u>.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to

VTI Stock Purchase Agreement 210210

the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

i.      Amendments and Waivers.   Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

j.      Severability.  If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

k.      Delays or Omissions.   No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

l.      Entire Agreement.   This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

m.      Dispute Resolution; Waiver of Jury Trial.   The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR

VTI Stock Purchase Agreement 210210

THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.      Publicity.   The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state

VTI Stock Purchase Agreement 210210

performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A)  At the time of such sale, bars the person from:

(1)  Association with an entity regulated by such commission, authority, agency, or officer;

(2)  Engaging in the business of securities, insurance or banking; or

(3)  Engaging in savings association or credit union activities; or

(B)  Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)  Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)  Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

VTI Stock Purchase Agreement 210210

(viii) Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210210

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

VTI Stock Purchase Agreement 210210

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

VTI Stock Purchase Agreement 210210

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or thesharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**



VTI Stock Purchase Agreement 210210

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210210

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**
Visual Technology Innovations, Inc.

By: _Mathu Rajan_
Name:   Mathu Rajan
Title:   President
Address:  1105 William Penn Dr
        Philadelphia, PA 19020

**INVESTOR**
Burlington Resources Asia Limited

By: _____
Name:   Timothy McCarthy
Title:   CEO
Address:  Old St. James's Vicarage,
        Maxwell Road,
        London SW6 2HR, UK

VTI Stock Purchase Agreement 210210

## ACCREDITED INVESTOR CERTIFICATION

### For Individual Investors Only
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

Initial _____     I certify thatI have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

Initial _____     I certify thatI have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

### For Non-Individual Investors
**(all Non-Individual Investors must *INITIAL* where appropriate):**

Initial _____     The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

Initial _____     The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

Initial _____     The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

Initial _____     The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

Initial _____     The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

Initial _____     The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

Initial _____     The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

Initial _____     The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

Initial _____     The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

Initial _____     The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

Initial _____     The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210210

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth:_____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth:_____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210210

### Section B – Entity Investor Information

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number:  _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust)  _____

Type of Business:  Investment Holding Company

Street Address:  20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code:  _____

Phone: _____+44 7768943655    Fax:  _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210210

## EXHIBIT A

Form of Presentation

1. Presentation of the opportunity
2. Cost of the opportunity
3. Subscription agreement for Shares with date of wire

## EXHIBIT B

### Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

### Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: ■■■■5235<br>Routing/ABA Number:121000248 |

VTI Stock Purchase Agreement 210210

| International Wire | Account: ▮▮▮5235 |
|---|---|
| | SWIFT: WFBIUS6S |

# Exhibit D
## -$300m Amendment-

VTI Stock Purchase Agreement 210506

## AMENDED STOCK PURCHASE AGREEMENT

An amended agreement ("**Agreement**"), dated as of May 6, 2021 (the "**Effective Date**") , by and between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong    (the "**Investor**"), with the Company and the Investor together referred to as the "**Parties**."

**WHEREAS**, the Company is an entity  formed pursuant to the laws of the State of Nevada USA as a Nevada corporation, and

**WHEREAS,** The Company desires to issue and sell to the Investor Class A Common Shares issued by the Company (the "**Shares**");

**WHEREAS**, the Investor  desires to purchase the Shares on the terms and conditions set forth herein; and

**WHEREAS**, the Company currently has  Class A Common Stock ("**Shares**") having a par value $0.00001 per share to be issued to Investor as a part of this Agreement; and

**WHEREAS**, Class B Voting Stock has been issued to the Company's founder or his wholly-owned entity, such Class B Voting Stock enjoys 10:1 voting rights, pursuant to the Amended and Restated Certificate of Incorporation, and such issuance of the Class B Voting Shares is being identified to Investor in the spirit of full disclosure to Investor; and

**WHEREAS**, the Parties have had several other agreements and modifications executed between themselves prior to the Effective Date (the "**Prior Agreements**") and two of the Prior Agreements were  Stock Purchase Agreements dated as of Feb 10, 2021 and May 3, 2021 (the "**Prior Stock Purchase Agreements**").

**NOW THEREFORE**, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the Parties agree to be bound by the terms as set out below.

## TERMS

1)    The Prior Stock Purchase Agreementis are hereby amended in their entirety and replaced by this Agreement.

2)    Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of One Hundred and Eighty Million US Dollars ($ 180,000,000) (the "**Investment Amount**") and an optional Accelerated Investment of up to One Hundred and Twenty Million US Dollars (US $120,000,000) for a total of Three Hundred Million US Dollars (US $300,000,000).

3)    The Investment Amount is split into three (3) tranches of Sixty Million US Dollars (US $60,000,000) each a ("**Tranche**") with the first Tranche invested on or before May 24, 2021; the

VTI Stock Purchase Agreement 210506

second Tranche invested on or before May 31, 2022; and the third Tranche invested on or before May 31, 2023 (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4)      The Investor retains an option for 60 days from the first Closing ("**Accelerated Period**") to accelerate the investments from the second and third Closings to occur within the Accelerated Period ("**Accelerated Investment**"). The second and third Closings will remain an option for the Investor even in the event of an Accelerated Investment.

5)      The price per Share at the first Closing is to be $1.40 per Share and the for each subsequent Closing is a twenty-five percent (25%) discount to the last transacted price per Share for the Company at the time of Closing.

6)      The validity of the Agreement is not subject to the execution of the first Closing, but binding and irrevocable upon execution of this Agreement.

7)      The Investor shall pay to the Company in immediately available funds a payment equal to the Investment amount for each Closing to the Company's bank account ("**Payment**") by executing the exercise form reflected at Exhibit A hereto.

8)      The purchase and sale of the Shares of each Tranche shall take place remotely via the exchange of documents and signatures, at 10 a.m. Eastern Time, on the date hereof of each Closing. The issue date of the Shares of each Tranche will be the date of receipt of funds from each Closing in the designated bank account per **Exhibit B hereto.**

9)      Use of Proceeds.  In accordance with the directions of the Company's Board of Directors, the Company will use the proceeds from the sale of the Shares for any lawful general business purpose related to the Company.

## REPRESENTATIONS AND WARRANTIES

10)     Representations and Warranties of the Company.  The Company hereby represents and warrants to Investor that, except as set forth on the Disclosure Schedule attached hereto, which exceptions shall be deemed to be part of the representations and warranties made hereunder, the following representations are true and complete as of the date of the Closing, except as otherwise indicated.

        a.      Organization.  The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Nevada and has all requisite corporate power and authority to carry on its business as presently conducted.

        b.      Capitalization. The Company currently has two classes of outstanding stock. There is Class A Common Stock and Class B Voting Stock. The rights, privileges and preferences of the Class A Common Stock and Class B Voting Stock are stated in the Amended and Restated Certificate of Incorporation and as otherwise provided by the Nevada General Corporation Law. All issued and outstanding shares of the Company's Class A Common Stock and Class B Voting Stock will have been duly authorized and validly issued and will be fully

VTI Stock Purchase Agreement 210506

paid and non-assessable. The fully diluted capitalization table of the Company will be provided prior to each Closing.

c.      Authorization.  All corporate action required to be taken by the Company's Board of Directors and stockholders in order to authorize the Company to enter into this Agreement has been taken or will be taken prior to the Closing.  All action on the part of the officers of the Company necessary for the execution and delivery of this Agreement, the performance of all obligations of the Company under this Agreement to be performed as of each Closing, and the issuance and delivery of the Shares has been taken or will be taken prior to the Closing.  This Agreement constitutes the valid and legally binding obligation of the Company, enforceable against the Company in accordance with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally, or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

d.      Valid Issuance of Shares.  The Shares have been duly authorized and, when issued, sold and delivered in accordance with the terms and for the consideration set forth in this Agreement, will be validly issued.

e.      Governmental or Other Consents and Filings.  Assuming the accuracy of the representations made by the Investor in this Agreement, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any federal, state or local governmental authority or other person is required on the part of the Company in connection with the consummation of the transactions contemplated by this Agreement, except for filings, if any, pursuant to applicable securities laws.

f.      Litigation.  There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending against the Company, or that questions the validity of this Agreement or the right of the Company to enter into this Agreement, or to consummate the transactions contemplated by this Agreement. The Company is not subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality.

g.  Intellectual Property.  Except as set forth in the Disclosure Schedule:

i.      The Company owns or possesses sufficient legal rights to use all foreign and domestic rights in, to and concerning (i) trademarks, brand names, d/b/a's, Internet domain names, logos and trade names; (ii) patents, registrations, and applications therefore; and (iii) copyrights and registrations and applications therefore (collectively, the "Intellectual Property") in all material respects necessary for its business as currently conducted.

ii.      The Company has not received any communications alleging that the Company has violated or, by conducting its business as presently conducted, would violate any of the Intellectual Property of any other person.

iii.      The Company has the right to use the Intellectual Property owned by it free and clear of any rights, liens, encumbrances or claims of others, except that the possibility

VTI Stock Purchase Agreement 210506

exists that other persons may have independently developed trade secrets or technical information similar or identical to those of the Company. None of the Company's Intellectual Property has been cancelled or adjudicated invalid (other than any expiration in the ordinary course) or is subject to any outstanding order, judgment or decree restricting its use or adversely affecting or reflecting the Company's rights thereto.

iv.     All contracts relating to Intellectual Property to which the Company is a party are valid and binding in accordance with their terms, and the Company is not in material default of any material terms thereof.

h.     Compliance with Other Instruments. The Company is not in material violation or material default (i) of any provisions of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, or (iii) under any material contract to which it is a party or by which it is bound.

i.     The Company makes no representations or warranties with regard to any risks that may pertain to this investment from either an offering or a business perspective and accepts that the Investor acknowledged that it has made its investment based solely on its own due diligence.

j.     No Further Representations. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS SECTION 2, THE COMPANY HAS NOT MADE ANY OTHER REPRESENTATIONS AND WARRANTIES AND HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT MADE OR INFORMATION COMMUNICATED (WHETHER ORALLY OR IN WRITING) TO INVESTOR OR ITS REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION OR ADVICE, WHICH MAY HAVE BEEN PROVIDED TO INVESTOR OR ITS REPRESENTATIVES BY ANY DIRECT OR INDIRECT EQUITYHOLDER, DIRECTOR, OFFICER, EMPLOYEE, ACCOUNTING FIRM, LEGAL COUNSEL, OR OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF ANY EQUITYHOLDER OF THE COMPANY OR ANY ESTIMATES, PROJECTIONS OR OTHER FORECASTS AND PLANS (INCLUDING THE REASONABLENESS OF THE ASSUMPTIONS UNDERLYING SUCH ESTIMATES, PROJECTIONS AND FORECASTS) INCLUDED IN ANY SUCH INFORMATION OR COMMUNICATIONS).

11)     Representations and Warranties of Investor. Investor hereby represents and warrants to the Company that:

a.     Authorization. Investor has full power and authority to enter into this Agreement and perform its obligations hereunder. This Agreement constitutes the valid and legally binding obligation of Investor, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

b.     Purchase Entirely for Own Account. Investor confirms that the Shares are being acquired for investment for the Investor's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and Investor has no present intention of

VTI Stock Purchase Agreement 210506

selling, granting any participation in, or otherwise distributing the same. Investor does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to the Shares. The Investor has not been formed for the specific purpose of acquiring the Shares.

c.      Securities Laws. The Investor hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Shares or any use of this Agreement, including (i) the legal requirements within its jurisdiction for the purchase of the Shares, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained, and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale, or transfer of the Shares. The Investor's subscription and payment for and continued beneficial ownership of the Shares will not violate any applicable securities or other laws of the Investor's jurisdiction. The Investor hereby represents that it is not acquiring the Shares for the account or benefit of any U.S. Person and that it has no agreement, understanding or intention to distribute, sell, transfer or pledge the Shares, directly or indirectly, in the United States or to U.S. Persons. The Investor hereby agrees that it will not offer, sell, transfer or otherwise dispose of the Shares or any securities issued in respect of or exchange for the Shares except under circumstances which will not result in a violation of Regulation S under the Securities Act, that the Investor shall not engage in hedging transactions with regard to the Shares unless in compliance with the Securities Act.

d.      Disqualification. Investor represents that neither Investor, nor any person or entity with whom Investor shares beneficial ownership of Company securities, is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the Securities Act (attached hereto as Annex I).

e.      Acknowledgment. Investor acknowledges that neither the Company nor any other person acting on behalf of the Company has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Company, except as expressly set forth in this Agreement. The Investor acknowledges that any investment it makes is made without any representations or warranties of the Company with regard to any risks that may pertain to the investment from either an offering or a business perspective. The Investor has made its investment based solely on its own due diligence. Investor acknowledges that there are uncertainties inherent in attempting to make such projections and plans, that Investor is familiar with such uncertainties, and that Investor shall have no claim with respect thereto.    Investor acknowledges that it has conducted to its satisfaction an independent investigation and verification of the financial condition, results of operations, assets, liabilities, properties and projected operations of the Company and, in making its determination to proceed with the transactions contemplated by this Agreement, Investor has relied on the results of its own independent investigation and verification

## MISCELLANEOUS

12)    Miscellaneous.

a.      Successors and Assigns. This Agreement may not be assigned by the Investor without the express written consent of the Parties. The provisions hereof shall inure to the

VTI Stock Purchase Agreement 210506

benefit of, and be binding upon the Parties hereto and their respective successors, permitted assigns, heirs, executors and administrators.

     b.     Expenses.  Each party to this transaction shall bear its own expenses, including but not limited to legal fees.

     c.     Confidentiality.  Each party agrees that, except with the prior written consent of the other party, it shall at all times keep confidential and not divulge, furnish or make accessible to anyone any confidential information, knowledge or data concerning or relating to the business or financial affairs of the other parties to which such party has been or shall become privy by reason of this Agreement.

     d.     Placement Agents.  Such placement agents as the Company may disclose to the Investor.  Such placement agents shall be compensated on such terms as the Company may agree to in its discretion.

     e.     Governing Law.  This Agreement and any disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by and construed in accordance with the domestic laws of the State of Nevada USA without giving effect to any choice or conflict of law provision or rule (whether of the State of Nevada USA or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Nevada USA.

     f.     Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile, electronic mail (including pdf) or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes.

     g.     Titles and Subtitles.  The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

     h.     Notices.  All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the party to be notified, (b) when sent, if sent by electronic mail or facsimile during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page, or to such e-mail address, facsimile number or address as subsequently modified by written notice given in accordance with this section.

     i.     Amendments and Waivers.  Any term of this Agreement may be amended, terminated or waived only with the written consent of the Parties.

VTI Stock Purchase Agreement 210506

j.  <u>Severability</u>. If any term, provision, covenant or restriction of this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, then a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid, void or unenforceable provision and the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated thereby.

k.  <u>Delays or Omissions</u>. No delay or omission to exercise any right, power or remedy accruing to any party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing. All remedies, either under this Agreement or by law or otherwise afforded to any party, shall be cumulative and not alternative.

l.  <u>Entire Agreement</u>. This Agreement constitutes the full and entire understanding and agreement between the Parties with respect to the subject matter hereof, and any other written or oral agreement relating to the subject matter hereof existing between the Parties are expressly canceled.

m.  <u>Dispute Resolution; Waiver of Jury Trial</u>. The Parties (a) hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the District Court of Justice of the State of Nevada sitting in Las Vegas, Nevada and the federal courts of the United States of America located in the State of Nevada, as well as to the jurisdiction of all courts to which an appeal may be taken from such courts, for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the aforementioned courts, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above-named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court

WAIVER OF JURY TRIAL: EACH PARTY HEREBY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, THE OTHER TRANSACTION AGREEMENTS, THE SECURITIES OR THE SUBJECT MATTER HEREOF OR THEREOF. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING, WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS (INCLUDING NEGLIGENCE), BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. THIS SECTION HAS BEEN FULLY DISCUSSED BY EACH OF THE PARTIES HERETO AND THESE PROVISIONS WILL

VTI Stock Purchase Agreement 210506

NOT BE SUBJECT TO ANY EXCEPTIONS. EACH PARTY HERETO HEREBY FURTHER WARRANTS AND REPRESENTS THAT SUCH PARTY HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL, AND THAT SUCH PARTY KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

n.    Publicity.  The Investor shall not issue any press release or make any public disclosure with respect to this Agreement and the transactions contemplated hereby, unless such press release or public disclosure shall be approved in advance by the Company.

## ANNEX I

Rule 506(d)(1)(i) to (viii) under the Securities Act of 1933, as amended:

(i) Has been convicted, within ten years before such sale (or five years, in the case of issuers, their predecessors and affiliated issuers), of any felony or misdemeanor:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(ii) Is subject to any order, judgment or decree of any court of competent jurisdiction, entered within five years before such sale, that, at the time of such sale, restrains or enjoins such person from engaging or continuing to engage in any conduct or practice:

(A) In connection with the purchase or sale of any security;

(B) Involving the making of any false filing with the Commission; or

(C) Arising out of the conduct of the business of an underwriter, broker, dealer, municipal securities dealer, investment adviser or paid solicitor of purchasers of securities;

(iii) Is subject to a final order of a state securities commission (or an agency or officer of a state performing like functions); a state authority that supervises or examines banks, savings associations, or credit unions; a state insurance commission (or an agency or officer of a state performing like functions); an appropriate federal banking agency; the U.S. Commodity Futures Trading Commission; or the National Credit Union Administration that:

(A) At the time of such sale, bars the person from:

(1) Association with an entity regulated by such commission, authority, agency, or officer;

(2) Engaging in the business of securities, insurance or banking; or

Page 8 of 20

VTI Stock Purchase Agreement 210506

(3)  Engaging in savings association or credit union activities; or

(B)  Constitutes a final order based on a violation of any law or regulation that prohibits fraudulent, manipulative, or deceptive conduct entered within ten years before such sale;

(iv)  Is subject to an order of the Commission entered pursuant to section 15(b) or 15B(c) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(b) or 78o-4(c)) or section 203(e) or (f) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-3(e) or (f)) that, at the time of such sale:

(A)  Suspends or revokes such person's registration as a broker, dealer, municipal securities dealer or investment adviser;

(B)  Places limitations on the activities, functions or operations of such person; or

(C)  Bars such person from being associated with any entity or from participating in the offering of any penny stock;

(v)  Is subject to any order of the Commission entered within five years before such sale that, at the time of such sale, orders the person to cease and desist from committing or causing a violation or future violation of:

(A)  Any scienter-based anti-fraud provision of the federal securities laws, including without limitation section 17(a)(1) of the Securities Act of 1933 (15 U.S.C. 77q(a)(1)), section 10(b) of the Securities Exchange Act of 1934 (15 U.S.C. 78j(b)) and 17 CFR 240.10b-5, section 15(c)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78o(c)(1)) and section 206(1) of the Investment Advisers Act of 1940 (15 U.S.C. 80b-6(1)), or any other rule or regulation thereunder; or

(B)  Section 5 of the Securities Act of 1933 (15 U.S.C. 77e).

(vi)  Is suspended or expelled from membership in, or suspended or barred from association with a member of, a registered national securities exchange or a registered national or affiliated securities association for any act or omission to act constituting conduct inconsistent with just and equitable principles of trade;

(vii)  Has filed (as a registrant or issuer), or was or was named as an underwriter in, any registration statement or Regulation A offering statement filed with the Commission that, within five years before such sale, was the subject of a refusal order, stop order, or order suspending the Regulation A exemption, or is, at the time of such sale, the subject of an investigation or proceeding to determine whether a stop order or suspension order should be issued; or

(viii)  Is subject to a United States Postal Service false representation order entered within five years before such sale, or is, at the time of such sale, subject to a temporary restraining order or preliminary injunction with respect to conduct alleged by the United States Postal Service to constitute a scheme or device for obtaining money or property through the mail by means of false representations.

VTI Stock Purchase Agreement 210506

## DISCLOSURE SCHEDULE

This Disclosure Schedule is delivered pursuant to and in connection with the Shares, as of the Effective Date, by and between the Parties.

Capitalized terms used but not defined herein shall have the respective meanings assigned thereto in the Agreement. The representations and warranties of the Company in the Agreement are made and given subject to the disclosures contained in the following schedules. Any matters disclosed in any part of this Disclosure Schedule shall be deemed disclosed for purposes of each other part of these Disclosure Schedules in which it is apparent on its face that it applies to such other section of this Disclosure Schedule.

The inclusion of any fact, item, matter, circumstance, transaction or event on a schedule is not deemed to be an admission or representation that the fact, item, matter, circumstance, transaction or event is or is not "material" and such inclusion shall not be deemed an acknowledgment that such fact, item, matter circumstance, transaction or event is required to be disclosed pursuant to the Agreement. In no event shall the listing of any matters in this Disclosure Schedule be deemed or interpreted to broaden or otherwise amplify the representations and warranties or covenants of the Company contained in the Agreement.

The introductory language and the heading to each schedule, if any, are inserted for convenience only and shall not create a different standard for disclosure than the language set forth in the Agreement. Headings in the schedules are inserted for convenience only and shall not create a representation regarding the completeness or accuracy of the organization of the information on such schedules.

| | |
|---|---|
| Organization | No exceptions |
| Capitalization | No exceptions |
| Authorization | No exceptions |
| Valid Issuance of Shares | No exceptions |
| Governmental or Other Consents and Filings | No exceptions |
| Litigation | The Company does not believe at this time that any claims are material to the Company's business or ongoing operations. |
| Intellectual Property | No exceptions |
| Compliance with Other Instruments | No exceptions |
| No Further Representations | No exceptions |

VTI Stock Purchase Agreement 210506

## PRIVACY AND CONSENT

### *Privacy Statement and Consent under The European Union General Data Protection Regulation (GDPR)*

The European Union General Data Protection Regulation (**GDPR**) requires every organization that collects sensitive personal data to request clear and specific consent regarding that data. According to the GDPR, personal data is any information that can be used to identify the data subject providing the personal data. GDPR best practices require the ability to obtain valid consent from the Company's investors to allow for the lawful collection and processing of personal data, as well as the ability for those investors to withdraw their consent.

The conditions of valid consent under the GDPR are that consent needs to be:

- freely given
- specific, per purpose
- informed
- an unambiguous indication
- given by a statement or by a clear act
- distinguishable from other matters
- in clear and plain language, intelligible, and easily accessible

### Privacy Statement – Q&A

- What kinds of personal information about you does the Company process?
  **Only that information you provided to the Company when you invested in the Company and may subsequently update.**

- What is the source of your personal information?
  **Provided when you invest in the Company.**

- What do we use your personal data for?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- What are the legal grounds for our processing of your personal information (including when we share it with others)?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- When does the Company share your personal information with other parties?
  **As required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- How and when can you withdraw your consent?
  **You may withdraw your consent at any time after you have fully disposed of your interest in the Company.**

VTI Stock Purchase Agreement 210506

- Is your personal information transferred inside or outside the EU?
  **Yes, as required by law, for our auditors, or in the case of your name and holdings only, for investment bankers and past or future investors under confidentiality when performing due diligence on the Company.**

- Do we share your information with credit reference agencies?
  **No.**

- Do we share your information with Fraud Prevention Agencies?
  **No.**

- What should you do if your personal information changes?
  **Notify the Company in writing of the appropriate changes.**

- Do you have to provide your personal information to the Company?
  **Under the laws of various countries, including the USA, such information sharing may be required for the acceptance by the Company of your investment by the Company.**

- Does the Company do any monitoring involving the processing of your personal information?
  **Yes, to the extent required for safeguarding of such or the sharing such information.**

- What about other automated decision making?
  **There is none.**

- For how long is your personal information retained by the Company?
  **For so long as you remain an investor in the Company, or longer as and if required by law.**

- What are your rights under data protection laws?
  **The rights to notice, privacy, consent and the withdrawal thereof. If the Company needs the data to operate the service or to meet a legal requirement, such requirement will be communicated to the investor and the request denied or restrict processing of the data.**

VTI Stock Purchase Agreement 210506

## Form of Consent

Any personal information (the "Information") you provide to the Company, including and similar to your name, address, telephone number, e-mail address, copy of your ID, financial information, curriculum vitae and tax information, will be handled with care. This data will only be accessible by those Company employees or contractors where the processing is necessary for the performance of the retention of Confidential Information or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company. Your Information will not be released or released outside of the Company except as noted below.

- *Only Company employees or contractors will have access to your information on a strict need-to-know basis. prior to sharing with investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your Information is registered in the Company's records and is available to only Company employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company.*
- *Your grant of consent covers future provisions of Information.*
- *You approve that your Information will be made available to only employees. or contractors on a strict need-to-know basis or for the purposes of the Company's legitimate interest in informing investment bankers and past and future investors upon request in connection with their due diligence concerning the Company and as required by law.*
- *You can send a request for removal of your Information at any time to our Investor Relations representative which shall be honored if possible. If it cannot be honored, you will be advised explaining the reasons thereof.*
- *You have the right to require the Company to delete Information in circumstances where: (a) the data is no longer necessary for the purpose in relation to which it was collected; (b) consent to processing has been withdrawn (if the Company has relied on your consent to process and access the personal data); (c) the Information was processed in breach of the GDPR; (d) the Information has to be deleted to comply with a legal obligation; or (e) you object to the processing and there are no compelling grounds to obviate that objection (such as the data being required in legal claims involving the Company).*
- *In case you would like to make use of this right at (e) above, please send your request to the Company's Investor relations representative.*
- *Requests for any changes to your Information can be sent to our Investor Relations representative and will be processed appropriately.*

**By my signature(s), I have acknowledged that I have read and understand the Company policy and have thereby provided my consent to the Company under GDPR.**

VTI Stock Purchase Agreement 210506

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:    Mathu Rajan
Title:    President
Address:  1105 William Penn Drive
          Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:    CEO
Address:  Old St. James's Vicarage,
          Maxwell Road,
          London SW6 2HR, UK

VTI Stock Purchase Agreement 210506

## ACCREDITED INVESTOR CERTIFICATION

**For Individual Investors Only**
**(All individual investors must *INITIAL* where appropriate. Where there are joint investors both parties must *INITIAL*):**

**Initial** _____  I certify that I have a "net worth" of at least $1 million either individually or through aggregating my individual holdings and those in which I have a joint, community property or other similar shared ownership interest with my spouse.[1]

**Initial** _____  I certify that I have had an annual gross income for the past two years of at least $200,000 (or $300,000 jointly with my spouse) and expect my income (or joint income, as appropriate) to reach the same level in the current year.

**For Non-Individual Investors**
**(all Non-Individual Investors must *INITIAL* where appropriate):**

**Initial** _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that is 100% owned by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____  The undersigned certifies that it is a partnership, corporation, limited liability company or business trust that has total assets of at least $5 million and was not formed for the purpose of investing in Company.

**Initial** _____  The undersigned certifies that it is an employee benefit plan whose investment decision is made by a plan fiduciary (as defined in ERISA §3(21)) that is a bank, savings and loan association, insurance company or registered investment adviser.

**Initial** _____  The undersigned certifies that it is an employee benefit plan whose total assets exceed $5,000,000 as of the date of the Subscription Agreement.

**Initial** _____  The undersigned certifies that it is a self-directed employee benefit plan whose investment decisions are made solely by persons who meet either of the criteria for Individual Investors, above.

**Initial** _____  The undersigned certifies that it is a U.S. bank, U.S. savings and loan association or other similar U.S. institution acting in its individual or fiduciary capacity.

**Initial** _____  The undersigned certifies that it is a broker-dealer registered pursuant to §15 of the Securities Exchange Act of 1934.

**Initial** _____  The undersigned certifies that it is an organization described in §501(c)(3) of the Internal Revenue Code with total assets exceeding $5,000,000 and not formed for the specific purpose of investing in Company.

**Initial** _____  The undersigned certifies that it is a trust with total assets of at least $5,000,000, not formed for the specific purpose of investing in Company, and whose purchase is directed by a person with such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment.

**Initial** _____  The undersigned certifies that it is a plan established and maintained by a state or its political subdivisions, or any agency or instrumentality thereof, for the benefit of its employees, and which has total assets in excess of $5,000,000.

**Initial** _____  The undersigned certifies that it is an insurance company as defined in §2(a)(13) of the Securities Act of 1933, as amended, or a registered investment company.

---

[1] For purposes of calculating net worth: (A) your primary residence shall not be included as an asset; (B) indebtedness that is secured by your primary residence, up to the estimated fair market value of the primary residence at the time of the sale of securities, shall not be included as a liability (except that if the amount of such indebtedness outstanding at the time of sale of securities exceeds the amount outstanding 60 days before such time, other than as a result of the acquisition of the primary residence, the amount of such excess shall be included as a liability); and (C) indebtedness that is secured by your primary residence in excess of the estimated fair market value of the primary residence at the time of the sale of securities shall be included as a liability.

VTI Stock Purchase Agreement 210506

## INVESTOR PROFILE

*(Must be completed by Investor)*

### Section A - Personal Investor Information

Investor Name(s): _____

Individual executing Profile or Trustee: _____

Social Security Numbers / Federal I.D. Number: _____

Date of Birth: _____ Marital Status: _____

Joint Party Date of Birth: _____
Investment Experience (Years): _____

Annual Income: _____
Liquid Net Worth: _____

Net Worth: _____

Resident of: _____
Home Street Address: _____

Home City, State & Zip Code: _____

Home Phone: _____ Home Fax: _____

Home Email: _____

Employer: _____

Employer Street Address: _____

Employer City, State & Zip (Postal) Code:
_____

Bus. Phone: _____ Bus. Fax: _____

Bus. Email: _____

Type of Business: _____

Sales Agent Account Executive / Outside Broker/Dealer: _____

VTI Stock Purchase Agreement 210506

### **Section B – Entity Investor Information**

Investor Name(s):  Burlington Resources Asia Limited

Authorized Individual executing Profile or Trustee:  Timothy McCarthy

Social Security Numbers / Federal I.D. Number: _____

Investment Experience (Years): 35 years

Assets: US $ 60m +

Was the entity formed for the specific purpose of purchasing the Shares?

[ ] Yes [X] No

Principal Purpose (Trust) _____

Type of Business:  Investment Holding Company

Street Address:  20th Floor, 88 Gloucester Road, Wanchai, Hong Kong

City, State & Zip Code: _____

Phone: _____+44 7768943655    Fax: _____

Email: tim@burlingtonresources-asia.com

Sales Agent Account Executive / Outside Broker/Dealer:  Knight-Davis Associates LLP

VTI Stock Purchase Agreement 210506

## EXHIBIT A

### FORM OF EXERCISE FOR TRANCHE _____, CLOSING _____

### TO: VISUAL TECHNOLOGY INNOVATIONS, INC.

ATTENTION: LEGAL

**(1)** The undersigned hereby elects to purchase _____ Shares of Visual Technology Innovations, Inc. (the "**Company**") in the name of the Investor at a price of US $_____ per Share for a total value of US $_____ pursuant to the terms of the attached Agreement, and tenders herewith Payment in full, together with all applicable transfer taxes, if any.

**(2)** The undersigned represents that (i) the aforesaid Shares are being acquired for the account of the undersigned for investment and not with a view to, or for resale in connection with, the distribution thereof and that the undersigned has no present intention of distributing or reselling such Shares; (ii) the undersigned is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision regarding its investment in the Company; (iii) the undersigned is experienced in making investments of this type and has such knowledge and background in financial and business matters that the undersigned is capable of evaluating the merits and risks of this investment and protecting the undersigned's own interests; (iv) the undersigned understands that the Shares issuable upon exercise of this Warrant have not been registered under the Securities Act of 1933, as amended (the "**Securities Act**"), by reason of a specific exemption from the registration provisions of the Securities Act, which exemption depends upon, among other things, the bona fide nature of the investment intent as expressed herein, and, because such securities have not been registered under the Securities Act, they must be held indefinitely unless subsequently registered under the Securities Act or an exemption from such registration is available; (v) the undersigned is aware that the aforesaid Shares may not be sold pursuant to Rule 144 adopted under the Securities Act unless certain conditions are met and until the undersigned has held the Shares for the number of years prescribed by Rule 144, that among the conditions for use of the Rule is the availability of current information to the public about the Company and the Company has not made such information available and has no present plans to do so; and (vi) the undersigned agrees not to make any disposition of all or any part of the aforesaid Shares unless and until there is then in effect a registration statement under the Securities Act covering such proposed disposition and such disposition is made in accordance with said registration statement, or the undersigned has provided the Company with an opinion of counsel satisfactory to the Company, stating that such registration is not required.

_____        _____
(Date)                                 (Signature)

                                       _____
                                       (Print name)

VTI Stock Purchase Agreement 210506

**EXHIBIT B**

## Bank Wire Instructions for Payment to Company

| | |
|---|---|
| Bank | Wells Fargo Bank NA<br>420 Montgomery<br>San Francisco, CA 94104 |
| Beneficiary | Visual Technology Innovations, Inc.<br>1105 William Penn Drive<br>Bensalem, PA 19020 |
| Domestic Wire | Account: ▮▮▮▮5235<br>Routing/ABA Number :121000248 |
| International Wire | Account: ▮▮▮▮5235<br>SWIFT: WFBIUS6S |

VTI Stock Purchase Agreement 210506

## Checklist for complete documentation

| Holder Status | Individual(s) | Entity |
|---|---|---|
| Executed paperwork | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Individual Investor Profile | ☐ Subscription Agreement<br>☐ Accredited Investor Questionnaire<br>☐ Entity Investor Profile |
| KYC/ID Requirements | ☐ Copy of any gov. issued photo ID (Driver's License, Passport, etc) | ☐ Entity Formation Documents (Cert of Incorporation, Articles, Deed, etc)<br>☐ Authorized Signatories list |
| Wire Funds: | ☐ Process bank wire | |
| Email to: | Suby.joseph@vti-global.com<br>☐ Executed Paperwork<br>☐ KYC/ID<br>☐ Bank Wire confirmation | |

# Exhibit E
# -$500m Amendment-

BRAL-VTI Amendment to Stock Purchase Agreement 210506

## AMENDMENT

THIS AMENDMENT ("**Amendment**"), dated as of May 10, 2021 is between Visual Technology Innovations, Inc., a Nevada USA Corporation (the "**Company**") and Burlington Resources Asia Limited, with an address at 20th Floor, 88 Gloucester Road, Wanchai, Hong Kong   (the "**Investor**") and amends the Stock Purchase Agreement executed on or about May 6, 2021 ("**Agreement**"). All capitalized terms not herein defined shall have the meaning ascribed to them in the Agreement. The Company and the Investor together referred to as the "**Parties**."

W I T N E S S E T H

**WHEREAS**, the Company and the Investor wish to amend the Agreement

**NOW THEREFORE**, the Parties hereto, in consideration of the recitals and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, hereby agree to amend the Agreement as follows:

1)    Unless otherwise specified herein, each term used herein that is defined in the Agreement, shall have the meaning assigned to such term in the Agreement.

2)    Section 2 of the Agreement is amended in its entirety and will henceforth read as follows:

> Subject to the terms and conditions of this Agreement, Investor agrees to purchase the Shares for the purchase price of a total of Five Hundred Million US Dollars (US$ 500,000,000) (the "**Investment Amount**").

3)    Section 3 of the Agreement is amended in its entirety and will henceforth read as follows:

> a.  The Investment Amount is split into five (5) separate tranches ("**Tranche**"). The first Tranche for an amount of Sixty Million US Dollars (US $60,000,000) invested on or before May 24, 2021; the next four (4) Tranches of One Hundred and Ten Million US Dollars (US $110,000,000) each invested a month from the prior Tranche (each a "**Closing**" and together the "**Closings**"). Each Tranche, when combined with each other Tranche, shall be referred to as the "**Tranches**." Each Closing has a 7 business-day cure period in case the funds are not received by the Company by the date of the Closing.

4)    Section 4 of the Agreement is voided.

5)    Except as expressly amended by this Amendment, the provisions of the Agreement, shall remain in full force and effect.

SIGNATURE PAGE FOLLOWS

BRAL-VTI Amendment to Stock Purchase Agreement 210506

IN WITNESS WHEREOF, the Parties have caused this Amendment to be duly executed on the date first written above.

**COMPANY**

Visual Technology Innovations, Inc.

By: _Mathu Rajan_

Name:    Mathu Rajan
Title:    President
Address:    1105 William Penn Drive
Philadelphia, PA 19020

**INVESTOR**

Burlington Resources Asia Limited

By: _____

Name:    Timothy McCarthy
Title:    CEO
Address:    Old St. James's Vicarage,
Maxwell Road,
London SW6 2HR, UK

Page 2 of 2

# Exhibit F
## -Email of McCarthy Prior Accomplishments-

From: Timothy McCarthy <tim@burlingtonresources-asia.com>
Date: Feb 13, 2021, 4:14 AM -0500
To: Mathu Rajan <mathu.rajan@vti-global.com>
Subject: Timothy McCarthy CV


Mathu,


I raised and invested 500 m $ in Sweta Estates Private Ltd. in 2008. It is one of the premier residential developers in Delhi and has built upscale residences in Gurgaon, a satellite city SW of New Delhi. Sweta operates under the brand Central Park which has a reputation for luxury and aspirational living for the upper echelons of Indian society and expats. I served on the Board of Sweta reporting to the Group CEO AMARJIT BAKSHI.

I invested and raised 750 m $ in Bangkok Land a major property developer in Bangkok, Thailand which enabled it to complete an integrated community with retail, hospitality and commercial and entertainment complexes in Muang Thong Thani, a northern suburb of Bangkok. In addition Bangkok Land owns IMPACT which consists of arenas, exhibition halls and one of the largest convention centres in Asia. It is a landmark property in Thailand and hosts all key events in the country. I worked closely with the Group Chairman recently deceased Anant Kanjanapas.


I invested US $ 75 million with a consortium in Richard Branson's record producing company V2 which he established after the sale of Virgin Records to Thorn EMI. I was on the board of V2.

I also invested I. and served on the Board of Richard Branson's companies that were involved in Cosmetics and a rival to Bodyshop and Virgin Jeans.

In my business career I have worked with Sovereign Funds, Hedge Funds, Captains of Industry, Political Leaders and a range of HNW and Family Offices with a special focus on Asia.

Best regards,


Tim McCarthy

CEO
Burlington Resources Asia Limited

# Exhibit G
## -Burlington Bank Statement-

# DBS

**Account Details**

| | |
|---|---|
| Account Number : | - USD |
| Product Type : | FOREIGN CCY SAVINGS ACCOUNT |
| Opening Balance : | 103,032,089.05  04-Feb-2021 |
| Ledger Balance : | 103,018,435.47  24-Feb-2021 |
| Available Balance : | 103,018,435.47  24-Feb-2021 |

| | |
|---|---|
| Account Name : | BURLINGTON RESOURCES ASIA LIMITED - - USD |
| Earmark Amount : | 0.00 |
| Overdraft Limit : | 0.00 |

| Post Date | Value Date | Transaction Details | Debit | Credit | Running Balance |
|---|---|---|---|---|---|
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE 0807ON0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref b9327e7b-3ed9-4b0e-b5a4-12deeaa0ae86a | 13,627.10 | | 103,018,461.95 |
| 06-Feb-2021 | 06-Feb-2021 | TRANSFER REMITTANCE CHARGES 0807ON0263042 Mgt Fee Jan UNION ALPHA C.P.A Mgt Fee Jan UETR Ref b9327e7b-3ed9-4b0e-b5a4-12deeaa0ae86a | 7.07 | | 103,018,454.88 |
| 07-Feb-2021 | 07-Feb-2021 | TRANSFER BK CHG OI0263042 | 19.41 | | 103,018,435.47 |

| | | | | |
|---|---|---|---|---|
| Total Debit Count : | 3 | Total Debit Amount : | | 13,653.58 |
| Total Credit Count : | 0 | Total Credit Amount : | | 0.00 |

Transactions performed on a non-working day will be posted on the next working day.
If date requested is a non business day, please select the next business day to view your transaction(s)

**\*\*END OF REPORT\*\***

# Exhibit H

# -Knight Asia Comfort Letter-



# KNIGHT ASIA LIMITED

10B, Shun Ho Tower, 24-30 Ice House Street, Central, Hong Kong
Tel: (852) 2509 9000    Fax: (852) 2509 3718

STRICTLY PRIVATE AND CONFIDENTIAL

18 February 2020

Visual Technology Innovations, Inc., ("VTI")
1105 William Penn Drive,
Philadelphia, PA 19020
USA.

Attention : Mathu Rajun, President

Dear Sir,

We confirm that we are ready, willing and able upon the express instructions of our client Burlington Resources FZE ( a wholly owned subsidiary of Burlington Resources Asia Limited) to make a payment of US$ 30 million from our bank DBS, Singapore to purchase certain shares in VTI subject to the terms and conditions in the Stock Purchase Agreement of 10 February 2021.

Please take note that in issuing this letter, we do not assume any obligation to notify you or inform you of any developments subsequent to this date that might render the contents above untrue or inaccurate in whole or in part at such later time.

This letter may be verified and authenticated at our offices.

Yours faithfully,

Mr. Jeremy King, Director

KNIGHT ASIA GROUP